1

2  My name is Mary Fuller. I am the sole owner of Disability Claims Consulting Services in
3  Portland, Maine.

4  My area of specialty is disability insurance, specifically: contract analysis, claims
5  practices and procedures, and underwriting. I have worked in the field of disability insurance for
6  17 years and as an Expert in Disability litigation for twelve years. I have been retained in this
7  matter as an Expert in Disability claims. I have attached the CV outlining my training and
8  experience as Exhibit 1.

9  **Industry Standards**

10  It is a matter of fundamental understanding in the disability insurance industry that in
11  administering the claims of their insureds, disability carriers have the following obligations
12  among others:

13  • To fully investigate the relevant and applicable facts of a claim.

14  • To fairly consider all information obtained, including that which tends to favor claim
15  payment or continuation as well as that which tends to favor claim declination or
16  termination;

17  • To consider the interests of its insureds at least equal to its own and to resolve
18  indeterminable issues in their insured's favor;

19  • To promptly and accurately notify their insureds of significant information or
20  applicable policy provisions which might adversely affect their claims;

21  • To promptly and timely pay benefits owed under the policy;

22  • To establish and maintain procedures for the purpose of guaranteeing compliance of
23  these obligations;

- To know and understand the language and meaning of their insurance policies and to administer their claims accordingly;

- To know and understand the applicable laws of the controlling jurisdiction and to administer their insureds' claims accordingly;

- To be able to read, interpret and understand all of the pertinent medical information with sufficient clarity so as to be able to make a fair, objective, and thorough evaluation of their insureds' claims for disability benefits;

- Denial of a claim should never be based on speculation;

- Consultants should be objective in their assessment of facts and not attempt to bias the claims investigation process in any way;

- Documents relating to the company's policies or claims handling procedures should not be destroyed to avoid disclosure to its policyholders;

- To conduct a fair, thorough, and objective review.

I know these standards from my experience in the industry and as Expert. These standards are drawn from various industry organizations including; the International Claims Association of America, The National Association of Insurance Commissioners, policies and procedures manuals of leading insurance companies, and various state statutes pertaining to Fair Claims Practice Standard Regulations.

Generally accepted business practices within the insurance business industry require that claims professionals administer claims within the context of the various state laws, to conduct a fair, thorough, and objective review of all aspects of the claim in order to make a proper determination.

The claims process is expected to be conducted in a prompt manner, without requiring unnecessary information. In addition, claims examiners are expected to maintain proper documentation of the actions that occur within a claim. They are expected to inform the insured as to the policy provisions the status of their claim, and any issues that may be identified.

**50**     **Pertinent Policy provisions**

**51**     November 17, 1994 Connecticut Mutual Life Insurance Company issued Ms. Karnofsky policy
**52**     number 8095282 in the amount of $ 4,500 a month with a 90-day elimination period and a
**53**     benefit period to age 65. Her policy contained an Own Occupation rider; her occupation at time
**54**     of application was Anesthesiologist. The Policy also contained an Automatic Additional Benefit
**55**     Increase Rider of 5% of the initial Monthly benefit every year for five years, as of 2000 the
**56**     benefit amount was increased to $5,625 per month. (POL 008, MM 3203) Connecticut Mutual
**57**     Life Insurance Company merged with Massachusetts Mutual Life Insurance Company and
**58**     MassMutual remained as the surviving company that has succeeded to all liabilities duties and
**59**     rights of Connecticut Mutual. (MMPOL 3)

**60**     **Definitions**

**61**     **Doctor** is a licensed physician, other than the insured or Owner, parent, spouse, or child of the
**62**     insured or Owner parent, spouse, or child of the insured or Owner acting within the scope of
**63**     his/her license.

**64**     **Doctors Care:** The insured is receiving care by a doctor for a condition causing the insured's
**65**     disability.

**66**     **Occupation:** The insured's regular profession(s) or business(es) at the start of Disability.

**67**     Pertinent Policy Provisions:

**68**     **Total Disability** Under the Own Occupation Rider states: The Insured is Totally Disabled if
**69**     he/she cannot perform the main duties of his/her Occupation due to sickness or injury. The
**70**     insured must be under a doctor's care.

**71**     **Partial Disability** states: The insured is partially disabled if he/she

**72**     •   is suffering from a current Disability
**73**     •   is working at his/her occupation
**74**     •   has a loss of income
**75**     •   is under a doctor's care and

76    • can show a Demonstrated Relationship between the Loss of income and the current
77       Disability.

78    **Pre-Disability income:** The greater of: The average monthly income earned and received for
79    the last 12 months before the start of disability; or the average Monthly income earned or
80    received for the last 24 months before the start of Disability; or the Average monthly income
81    earned and received for the highest consecutive 24 months during the 60 months prior to
82    disability.

83    **Partial Disability Benefits**

84    We will pay a Partial Disability benefit if the Insured is Partially Disabled and during the
85    Waiting Period:

86    • the Insured has been Partially Disabled and had a Loss of Income of at least 20% of
87       Predisability Income.

88    or

89    • the Insured has been Totally Disabled for at least 30 days.

90    During the first 12 months of Disability, any monthly payment for Partial Disability will equal
91    50% of the Partial Disability Monthly Benefit shown in the Policy Specifications.

92    However, if we receive proof of Loss of Income of more than 50% of Pre-disability Income, the
93    Insured may qualify for a larger benefit. The monthly benefit will be determined as follows:

94    • If the Insured's Loss of Income is between 50%and 75% of Pre-disability Income, We
95       will pay the Partial Disability Monthly Benefit shown in the Policy Specifications by the
96       ratio of Loss of Income to Pre-disability Income.
97    • If the Insured's Loss of Income exceeds 75% of Pre-disability Income, We will pay the
98       Partial Disability Monthly Benefit shown in the Policy Specifications.

99    Beginning with the 13th month following the start of Disability, the monthly benefit will be
100   determined as follows:

101      •   If the Insured's Loss of Income is between 20% and 75% of Pre-disability Income, We
102            will pay the Partial Disability Monthly Benefit shown in the Policy Specifications
103            multiplied by the ratio of Loss of Income to Pre-disability Income.

104      •   If the Insured's Loss of Income exceeds 75% of Pre-disability Income, We will pay the
105            Partial Disability Monthly Benefit shown in the Policy Specifications.

106 **Recovery Benefit**

107 After a period of Disability payments, a Recovery Benefit will be paid provided the insured's
108 Loss of Income is at least 20% of Pre-disability Income. The Recovery Benefit will be paid
109 through the 6th month following the Insured's full recovery and return to his/her Occupation. The
110 monthly payment will equal the Partial Disability Monthly Benefit shown in the Policy
111 Specifications multiplied by the ratio of Loss of Income to Pre-disability Income.

112 After 6 months, We will periodically reevaluate the Demonstrated Relationship between the
113 Insured's Loss of Income and the previous Disability. We will continue to make monthly
114 payments as long as the Insured's Loss of Income is at least 20% of Pre-disability Income and
115 there is a Demonstrated Relationship between the Insured's Loss of Income and the previous
116 Disability. Monthly payments, however, will not exceed the Maximum Benefit Period for Partial
117 Disability.

118 The Policy also provided indexing of Pre-disability Income after each 12 consecutive months of
119 Disability as well as; Rehabilitation benefits for a program approved by the company, Survivor
120 benefits, and Waiver of premium benefits.

121

122 **Documents Reviewed;** Policy File MMPol 001-27, Claim file MM1 –MM3232, Unfair Claims
123 Settlement Practices Act, 2004 Multi State Market Conduct Examination of UnumProvident and
124 resulting RSA,   2005 California Market Conduct Examination of UnumProvident and Resulting
125 Decision and Order, O'Net occupational description of Anesthesiologist, and documents
126 reviewed are outlined in Exhibit 2

127

128

129

130 **Claim Summary Background**

131 Dr. Karnofsky purchased her Own Occupation policy from Connecticut Mutual Life Insurance

132 Company in November of 1994. Her occupation at time of issue was anesthesiologist. Dr.

133 Karnofsky continued to pay premiums for the next 17 years, while also continuing to work as an

134 anesthesiologist. In September of 2011 Dr. Karnofsky submitted a claim for disability resulting

135 from injury sustained in a motor vehicle accident in 2007; she explained that she continued to

136 work while seeking treatment for her neck injury, gradually reducing the time spent and duties

137 performed, until March of 2010 when she stopped working as an anesthesiologist altogether.

138 Prior to her claim submission Connecticut Mutual Life Insurance Company had merged with

139 Massachusetts Mutual Company resulting in the claim being administered by Massachusetts

140 Mutual. Dr. Karnofsky's policy defines occupation to be the insured's regular profession(s) or

141 business(es) at the start of Disability and defines total disability as the inability to perform the

142 main duties of his/her Occupation due to sickness or injury. Massachusetts Mutual, however,

143 refused to pay benefits prior to January of 2012, and only paid total disability benefits until June

144 of 2012, despite undisputed medical evidence supporting a permanent inability to perform

145 anesthesia as she had done prior to her disability. In addition, while Massachusetts Mutual has in

146 my opinion improperly continued to administer the claim as a partial claim, it has repeatedly

147 requested extensive financial documentation far beyond what is warranted under the policy even

148 if she were partially disabled. This has caused extensive delays and excessive costs to Dr.

149 Karnofsky, leaving her no alternative other than to file suit. Despite an insurers continuing duty

150 to investigate MassMutual ceased its claim investigation including investigation of financial

151 information submitted in December of 2013 in support of benefits owed from June 2012 forward

152 and a vocational review initially ordered in November of 2013,not completed until May of 2014

153 and never acted upon.

154

155                                      **Opinion**

156  It is my opinion MassMutual failed to: fully investigate the relevant and applicable facts of the
157  claim, fairly consider all information obtained, including that which tends to favor claim
158  payment or continuation as well as that which tends to favor claim declination or termination;
159  consider the interests of its insureds at least equal to its own; promptly and timely pay benefits
160  owed under the policy; know and understand the language and meaning of their insurance
161  policies; and conduct a fair, thorough, and objective review. The violation of those duties
162  constitutes a failure to comply with the good of good faith and fair dealing.

163    The basis for this opinion is set forth below:

164          • **Failure to fully investigate the relevant and applicable facts of a claim**

165  MassMutual's policy defines occupation as the insured's regular profession(s) or business(es) at
166  the start of Disability. On September 29 Dr. Karnofsky submitted a claim for disability related to
167  injuries she incurred in an accident in 2007 that culminated over time with the need for surgery
168  for cervical disc. Dr. Karnofsky explained she had tried numerous medications and treatment
169  modalities prior to surgery including: Physical therapy; muscle relaxants; NSAIDs and sleeping
170  pills; and had gradually cut back her work until she stopped altogether in 2010. At the time of
171  submission of the claim she had undergone a disc replacement for herniated discs at C5-6, 6-7
172  which was unsuccessful, and therefore she was scheduled to undergo a fusion from C5-7.

173  Dr. Karnofsky described her occupation as an anesthesiologist for 18 years following completion
174  of her residency program, 14 of which she was affiliated with Anesthesia Associates of
175  Charleston. (MM 656) Dr. Karnofsky described the physical requirements of her occupation to
176  include: constant bending, reaching, pulling, twisting, lifting, running; hand and arm strength;
177  manual dexterity; the ability to assist wheeling patients into the OR and/or assisting with lifting
178  patients. She explained she worked in various surgery centers doing anesthesia, pain
179  management, and obstetrics on call. (MM 657)

180  Dr. Karnofsky also explained she is unable to look down for more than 5 minutes without severe
181  pain in her neck and arms. Standing for 20 minutes causes back pain that radiates down both
182  legs, the toes of her left foot are numb, she cannot write without having tingling and pain in her
183  right arm, and she has decreased hand strength and a tremor.

184    She described as well needing pain pills, muscle relaxants and Anxiolytics[1] to get through the

185    day and that she is not able to take them when working. She described an inability to concentrate

186    or make decisions due to pain, lack of sleep, and her medications. Her diagnoses were:

187    displacement of cervical intervertebral disc, and post laminectomy syndrome of cervical region.

188    She had been treated by Dr. Fisher primary care, Dr. Faaberg anesthesiology, and Dr. Pacult

189    neurosurgeon. (MM 656-7)

190    In addition to Dr. Karnofsky's claim form, MassMutual also received an attending physician

191    statement (APS) from Dr. Poletti who reported Dr. Karnofsky was restricted from reaching over

192    her shoulder, and could occasionally sit, stand, and walk. She was not able to use her upper

193    extremities repetitively for tasks to: grasp, push, pull, and no fine manipulation with either hand,

194    all tasks required in performing anesthesia. (MM 580)

195    The disability determination requires an in-depth understanding of the occupational, medical,

196    and contractual aspect of the claim. The occupational investigation includes establishing the

197    material and substantial duties (or in this case main duties) of the insured's occupation, including

198    the physical and cognitive requirements necessary to perform them. The medical evaluation

199    involves verification of the restrictions and limitations (R&Ls) an insured experiences as a result

200    of their medical condition, including R&Ls resulting from treatment of same (such as side effects

201    of medication). Upon verification of R&Ls, a vocational analysis must be done to evaluate the

202    impact those restrictions and limitations have on the insured's ability to perform the main duties

203    of the occupation.

204    Ms. Mykytiuk, claims examiner for MassMutual, did not request a medical review at that time to

205    determine the reasonableness of the R&Ls set forth by Dr. Poletti, nor did she inquire as to the

206    side effects of Dr. Karnofsky's medications. She did not ask whether her use of medication was a

207    potential barrier to her working as an anesthesiologist. Despite the severity of Dr. Karnofsky's

208    condition, MassMutual did not conduct a medical review to address the reasonableness of Dr.

209    Karnofsky's R&Ls until December of 2011 (MM 580), and instead ordered a comprehensive

210    business check and a field visit. Ms. Mykytiuk also failed to ask for a vocational assessment of

---

[1] Anxiolytics are a type of prescription medication used to treat symptoms of acute anxiety.

211 duties involved in the performance of anesthesia, including the physical and cognitive
212 requirements necessary to perform those duties.

213 The comprehensive business check resulted in obtaining information regarding two businesses
214 that Dr. Karnofsky had incorporated in 2009 and 2010 which were not disclosed on the initial
215 claim form. MassMutual's investigation following receipt of information regarding LowCountry
216 Laser and Charleston Pain Center focused on limiting and/or eliminating altogether the financial
217 liability associated with Dr. Karnofsky's claim, and not on conducting a fair thorough
218 investigation.

219 Mr. Barone, field representative for MassMutual, met with Dr. Karnofsky and learned she had
220 worked 40 to 50 hours a week prior to her accident and had reduced her hours to 20 -30, until she
221 was terminated without cause, although Dr. Karnofsky reported it was a result of her reduction in
222 hours and operating room time. Dr. Karnofsky explained she had reduced her operating room
223 days to one day a week, but continued to take calls at Roper and affiliated surgical centers. She
224 explained as well she started to seek alternative fields of anesthesiology as she had difficulty
225 standing on her feet for long periods. She was having pain in her neck, arms, and legs when
226 standing over a patient and watching the monitor, and she had reached a point she felt she might
227 be putting her patients at risk, and would have left anyway due to the lack of improvement in her
228 condition.

229 Mr. Barone reported that Dr. Karnofsky had formed the LLC for Lowcountry in 2009 but did not
230 perform any procedures until June of 2010, after her termination, and that the work at
231 Lowcountry Laser involves laser-assisted lipolysis; body contouring, skin tightening and skin
232 treatments. Two people assist during procedures, and she uses general regional and local
233 anesthesia, depending on the procedure. Although Mr. Barone reported Dr. Karnofsky
234 administered anesthesia at Lowcountry Laser, Dr. Karnofsky does not have malpractice coverage
235 for anesthesia and, his report is contrary to other information contained in the file.

236 Dr. Karnofsky also had formed Charleston Pain Center in 2010 and continues to practice pain
237 management, which consists of spinal injections; however she was doing very little in that area at
238 the time of the meeting.  Dr. Karnofsky also explained that she was undergoing a fusion in
239 November  ( later moved to December) and that Dr. Poletti, her neurosurgeon whom she has

240  been seeing since March of 2010, has advised her not to return to anesthesia. She continues to
241  take Hydrochlorothiazide[2], Lortab[3], Soma[4], Ambien[5], Methylphenidate[6], Percocet [7]as needed,
242  Mobic[8], Ativan [9]and Wellbutrin[10]. (MM 2098-9)

243  The role of the field investigator is to not only observe the insured but to also obtain further
244  clarification on issues of importance to the claims determination via a face to face interview, thus
245  the integrity of the information obtained is critical to conduct a full, fair, and thorough review.
246  Although Mr. Barone reported Dr. Karnofsky administered general anesthesia while working at
247  Lowcountry Laser, Dr. Karnofsky does not have malpractice coverage for anesthesia and had
248  indicated she was unable to do so as a result of her cervical fusion. Dr. Karnofskys work at
249  Lowcountry Laser was unrelated to her pre disability occupation as an anesthesiologist.

250  Following the field visit, MassMutual did not conduct a vocational assessment to compare the
251  main duties of Dr. Karnofsky's pre disability occupation as an anesthesiologist working in a
252  hospital / surgery center based environment with the duties that Dr. Karnofsky was performing in
253  her occupation at the Lowcountry Laser Center and Charleston Pain Center.  MassMutual did not
254  recommend such a vocational review until November of 2013 did not refer the file for a review
255  until February and did not complete the review until May of 2014. The vocational review was
256  performed by Nawrocki & Smith Financial consultants, not vocational experts as one would
257  expect. The analysis provided was purely financial, it did not identify the material and substantial
258  duties of Dr. Karnofskys occupation as an anesthesiologist or the physical requirements
259  necessary to perform them, or comparison of those duties with the occupational duties of her
260  current work.  Although the report had been completed in May of 2014 MassMutual failed to
261  produce the report until November of 2014 and then only did so at the request of Attorney

---

[2] Hydrochlorothiazide treats fluid retention (edema) in people with congestive heart failure, cirrhosis of the liver, or kidney disorders.
[3] Lortab (acetaminophen and hydrocodone) is used to relieve moderate to severe pain.
[4] Soma (carisoprodol) is used treat injuries and other painful muscle conditions.
[5] Ambien (zolpidem) is a sedative, also called a hypnotic. It affects chemicals in your brain that may become unbalanced and cause sleep problems (insomnia)
[6] Methylphenidate is a central nervous system stimulant. It affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control
[7] Percocet contains a combination of acetaminophen and oxycodone. Oxycodone is an opioid pain medication. An opioid is sometimes called a narcotic.
[8] Mobic - Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) with analgesic and fever reducer effects.
[9] Ativan is a benzodiazepine used to treat anxiety disorders or anxiety associated with depression.
[10] Wellbutrin (bupropion) is used to treat major depressive disorder and seasonal affective disorder.

262  Kefalos. The report indicated that Dr. Karnofsky had performed both anesthesia and pain
263  management procedures while employed at Anesthesia Associates of Charleston and that she had
264  a decrease in her overall production beginning in April of 2008 which continued. Following
265  disability Dr. Karnofsky was not performing any anesthesia and her pain procedures decreased
266  from 1, 073 pre-disability to 229 post disability. (MM32348)

267  In addition, although Ms. Mykytiuk had informed Dr. Karnofsky that a vocational specialist may
268  contact her in order to obtain more detail as to the duties she performed prior to the onset of
269  disability, and those duties that she may no longer be able to perform. It appears the only
270  vocational intervention Mr. Fresa's November 29th phone call with Dr. Karnofsky, during which
271  he asked for procedure codes. Dr. Karnofsky responded that she was assigned to a room to
272  administer anesthesia, and that she had to administer anesthesia for whatever procedures were
273  scheduled and she had no control over that; Mr. Fresa did not ask for further explanation and
274  instead indicated he did not need any further information from her. (MM 2151)

275  Mr. Fresa's vocational involvement was cursory at best and inadequate in the context of an Own
276  Occupation disability claim. Mr. Fresa failed to address the essential components of a full, fair,
277  and thorough occupational review including: information regarding her malpractice coverage,
278  hospital privileges, on call schedule; professional standards relative to working while impaired
279  and/ or taking medications; and the physical /cognitive requirements necessary to perform the
280  duties of anesthesiologist.

281  • **Failed to fairly consider all information obtained, including that which tends to**
282      **favor claim payment or continuation as well as that which tends to favor claim**
283      **declination or termination.**

284  Ms. Mykytiuk informed Dr. Karnofsky that the late notice of claim for disability as of 2007 may
285  have prejudiced the company's ability to obtain the medical, occupational, and/or financial
286  information necessary to evaluate past periods of disability.

287  Although information was not immediately available regarding Dr. Karnofsky's 2007 medical
288  records, MassMutual did have the knowledge that Dr. Karnofsky had undergone a failed cervical
289  disc replacement surgery in July of 2011, and was going to undergo a two-level cervical fusion

290 in November. Despite the severity of Dr. Karnofsky's medical condition and the lack of any
291 medical review to dispute the restrictions and limitations set forth by Dr. Poletti, there is no
292 indication in the file that Ms. Mykytiuk considered evaluating Dr. Karnofsky's current claim for
293 total disability as of July 2011 while she gathered medical, occupational, and financial
294 information regarding possible further benefits for the period of 2007 to 2011.

295 On October 14, Dr. Karnofsky sent a letter describing her reason for filing a late claim. She
296 described symptoms immediately following her car accident including headache, soreness, and
297 back pain. She explained as well she sought treatment with Doctors Pacult and Fischer,
298 participated in physical therapy, and was prescribed steroids, anti-inflammatory medications,
299 pain meds, a TENS unit, sleeping pills, acupuncture, traction, and injections. Her condition,
300 however, only worsened.

301 She was diagnosed with herniated discs at c5-6 and 7 and an annular tear at L5- S1, and it was
302 recommended she undergo disc replacement. She also reported she was examined by Dr. Faaber
303 and had been found to be permanently partially impaired but that she kept trying to do as much
304 as possible.

305 Dr. Karnofsky explained the pain altered not only her professional life but her day-to-day
306 activities and relationships. Following surgery she had improvement in her symptoms; however
307 the symptoms returned and she was scheduled to undergo a fusion. She also explained she just
308 could not accept that she was disabled until her doctors told her to file for benefits and that she
309 can never again practice anesthesia. (MM 546)

310 It is evident that Dr. Karnofsky had been highly motivated to continue working while also trying
311 multiple treatment modalities in an attempt to find a solution to her chronic pain complaints. Dr.
312 Karnofsky also sent an email and explained she did not have any pay stubs and that the financial
313 information being requested could be found in the tax returns, which she was sending. She also
314 explained she did not have production reports and that she only files one tax return under her SS
315 number and there is nothing more to provide. (MM 544)

316 Following receipt of Dr. Karnofsky's explanation for late notice, MassMutual received extensive
317 medical records from Southern Spine Institute (MM 509 – 539) for the period of 2010 -2011.

318    She had been referred there by Dr. Alan Tanenbaum, due to three years of symptoms related to
319    her 2007 MVA. (MM 00536)

320    Records from Dr. Poletti were also included, noting among other things:

321    • Karnofsky is well known to me. I have known her for many years. She is an
322       anesthesiologist in the Roper Health Care System and has been working at Roper for
323       many, many years. She was involved in a motor vehicle accident in April of 2007.
324    • She has been seen by Dr. Pacult, has had multiple epidurals; and continues with low back
325       pain, hip pain, pain radiating into her neck and arm on the right, and pain radiating into
326       her buttocks, hip, and leg right greater, with a sensation of temperature change within the
327       right arm and a sensation of dysesthesia into the right leg with temporary relief from right
328       L-5 selective nerve root blocks as well as cervical injections.
329    • Saw Dr. Geer for non-operative pain management, sees Pacult and Cuddy. She
330       occasionally takes some narcotic analgesics and has had difficulty working, especially
331       doing activities such as general anesthesia to involve patient transfer or intubation
332       secondary to the pain and weakness in her right arm.
333    • MRI studies demonstrate the presence of multilevel disc bulging, a right-sided
334       paracentral disc herniation at the CS-6 level, to a lesser extent at the C6-7 level. In the
335       lumbar spine there is generalized disc bulging worse at the L5-S 1 level. There is some
336       slight measure of foraminal stenosis on the right.. Diagnosis: Disc disruption CS-6,
337       LS-S 1.
338    • Her symptoms are consistent with cervical and lumbar radiculopathy, and she will
339       require some type of surgical intervention, especially on her neck. I do believe that the
340       C5-6 disc is most likely the source of her pain,
341    • An April 2011 MRI found confirm increased sequestration of the disc at the C6-7 level
342       consistent with her clinical symptoms, she is a candidate to consider surgical intervention
343       in her cervical spine. Based on the C6-7 disc herniation, he recommended limiting the
344       surgery to C6-7 with a disc replacement. She has some limited forward flexion of her low
345       back and restricted motion in her neck with rotation to the right.

346 The initial follow-up records indicated Dr. Karnofsky was doing well until August 31 when she
347 began experiencing neck pain, right upper extremity numbness, and tingling radiating past her
348 right elbow. She has taken Percocet, Lortab, and Lidoderm patch ...X-rays taken at the time
349 indicate artificial disc replacement would at best be malposition, and it was recommend she
350 undergo a two-level fusion, as there was settling and rotation of the inferior aspect of the cervical
351 disc arthroplasty[11], contributing to her neck and shoulder pain.

352 Records from October included prescriptions for Valium[12], Percocet[13], Keflex [14]and
353 Doxycycline[15], with neck and arm pain no improvement, possible worsening, she also has severe
354 osteoporosis, therefore she may want to wait for surgery to maximize her bone quality. (MM
355 00513)

356 As of October MassMutual had objective medical evidence in support of Dr. Karnofsky's claim
357 for total disability as of 2011 including MRI's treatment notes and surgery records. Yet, despite
358 Dr. Karnofsky's obvious need for benefits, the file was not sent for a medical review until
359 December 5th and the review was not completed until December 27th.

360 MassMutual's consulting physician, Dr. Parisi found among other things:

361 • Between the date of the motor vehicle accident and the claimant's cervical surgery, the
362   claimant received extensive workup and treatment for her condition.
363 • A statement from Dr. Andrew Geer dated March 17, 2010 noted, "As result of her
364   accident sustained a severe level of permanent impairment and her resulting permanent
365   restrictions would make her incapable of performing her job as an anesthesiologist. I
366   would further concur that her symptoms as result of this accident make her a potential
367   candidate for cervical disc replacement or arthroplasty at C5-6, anterior lumbar interbody
368   fusion at L5-S1." (emphasis added)

---

[11] **Arthroplasty** (literally "[re-]forming of joint") is an orthopedic surgical procedure where the articular surface of a musculoskeletal joint is replaced, remodeled, or realigned by osteotomy or some other procedure.
[12] Valium is used to treat anxiety disorders, alcohol withdrawal symptoms, or muscle spasms.
[13] Percocet contains a combination of acetaminophen and oxycodone. Oxycodone is an opioid pain medication. An opioid is sometimes called a narcotic.
[14] **Keflex (cephalexin)** is used to **treat** infections caused by bacteria, including respiratory infections and ear infections.
[15] **Doxycycline** is an antibiotic for treating bacterial infections.

369    • "The claimant has had several diagnostic radiological studies of her back and neck in
370       2007, 2008, 2010, and 2011... The file documents multiple epidural steroid injections in
371       both her back and neck from 2007 forward."
372    • The office note dated October 12, 2011 reported continued evidence of anterior shifting
373       of the artificial disc replacement at C6-7.
374    • According to a field visit completed on November 3, 2011, the claimant was scheduled
375       for cervical fusion surgery on November 15, 2011.
376    • It is likely that the claimant had a period of total impairment around the time of her motor
377       vehicle accident in April of 2007 as well as around the date of her previous surgery in
378       July of 2011. Considering the postoperative problems with her total disc replacement and
379       her second more recent surgery, it would not be unreasonable to extend that period to the
380       current date.

381    It is evident from Dr. Parisi's medical review that Dr. Karnofsky suffered injuries in 2007 which,
382    per MassMutual's own medical reviewer, would have resulted in a period of total disability in
383    2007. It is also evident from the medical review that she continued to experience ongoing
384    symptoms of pain and sought treatment from several different physicians concerning her neck
385    and back complaints, had been prescribed numerous medications and undergone multiple
386    epidural steroid injections,  he opined: It therefore would be reasonable to support partial
387    impairment during that time frame. ( Emphasis added)  (MM 2143)

388    Although Ms. Mykytiuk had indicated that MassMutual may have been prejudiced by the late
389    notice of the claim, there was no evidence MassMutual was unable to obtain medical records
390    from 2007 forward which, Dr. Parisi opined, confirmed ongoing impairment. Although the
391    medical review did not opine on the extent of impairment, Ms. Mykytiuk did not investigate
392    further with her consulting physician, Dr. Parisi, or any of the treating physicians as to the
393    possible length of time that Dr. Karnofsky may have been totally disabled in 2007. She also
394    failed to investigate further Dr. Geer's report that Dr. Karnofsky had experienced a severe level
395    of impairment as a result of her accident in 2007 and had permanent restrictions including: what
396    the permanent restrictions were when they began, and how they impacted her ability to perform
397    the duties of her occupation.

398    In addition to medical evidence in support of disability, MassMutual also received financial

399    evidence in support of payment via her tax returns. Partial disability payment is determined by

400    establishing the pre-disability Net income and evaluating the percentage of lost earnings

401    following disability. The financial review of the 2004 through 2010 returns indicated that Dr.

402    Karnofsky's taxable income had dropped from $165,517 in 2004 to $123,769 in 2008 the year

403    following her accident, in 2009 it had dropped to $80,411 and in 2010 it had dropped to $46,

404    895. Dr. Karnofsky's gross wages had also declined from $178, 552 in 2004 to $142,000 in

405    2008, $102,345 in 2009 and $52, 414 in 2010 when she stopped work altogether. (MM 2149 -

406    2150)

407    The partial disability provision states:

408    We will pay a partial disability if the insured is partially disabled and during the waiting period

409    (in this case 90 days). The insured has been partially disabled and has a loss of at least 20% of

410    pre-disability income, or the insured has been totally disabled for at least 30 days.

411    During the first 12 months of Disability, any monthly payment for partial disability will equal

412    50% of the Partial Disability Monthly benefit shown in the policy specifications.

413    The Partial provision also states: If we receive proof of loss of income of more than 50% of pre-

414    disability income the insured may qualify for a larger benefit. In the event the financial records

415    showed a greater than 50%, loss the company could adjust the benefit amount.

416    Despite medical and financial information in support of partial disability as of 2007, rather than

417    issue a 50% payment with a reservation of rights while it continued its investigation,

418    MassMutual did not issue payment until January 30 and appears to have done so only as a result

419    of Dr. Karnofsky's complaint about MassMutual's investigation. Benefits were issued for total

420    disability as of July 2011 with a reservation of rights.

421    Reservation of rights is generally issued when there are questions still to be resolved as to

422    impairment. There was no question as to impairment as Dr. Parisis supported total disability

423    following surgery. In addition, it is unclear why MassMutual chose the start date of disability to

424    be July of 2011, as Dr. Parisi had opined that there was impairment as early as 2007, as

425  evidenced by the type /extent of treatment she had received during that time period (MM 2143)

426  and, Dr. Karnofsky had ceased performing all anesthesia as of March of 2010.

427  MassMutual's decision to pay under ROR and to only pay benefits as of July 2011 places the

428  financial interest of the company above that of its insured. MassMutual' s claim investigation

429  focused on eliminating and/or reducing the financial exposure associated with Dr. Karnofsky's

430  claim and continued to do so to this day.

431  MassMutual paid Dr. Karnofsky two months of disability and then stopped payments, with no

432  change in her medical or work status, and since that time has continued to demand unnecessary

433  financial information regarding her work at Lowcountry Laser and Charleston Pain.

434  MassMutual's insistence on financial information not only causes undue delay, it is not

435  appropriate in the context of an Own Occupation policy. Dr. Karnofsky was no longer working

436  in her occupation as an anesthesiologist, and therefore income from any other work is not

437  pertinent to eligibility under the policy.

438  **Failure to promptly pay benefits due under the policy.**

439  Following payment of total disability benefits for the period of July 2011 to December 2011,

440  MassMutual continued to request additional medical financial and occupational information for

441  the period of 2007 to 2010 and beyond without issuing any further payments. It was reasonable

442  to seek financial information for purposes of evaluating partial disability from 2007 to June of

443  2010 when Dr. Karnofsky was continuing to work in her occupation in a modified capacity. It

444  was not, however, proper to insist on financial information after she stopped working as an

445  anesthesiologist, as income from her new occupation is not pertinent in the context of an Own

446  Occupation policy. As noted previously, MassMutual had evidence of ongoing total disability

447  from anesthesia following its initial payment and yet MassMutual continues to withhold

448  payments.

449  In March, Dr. Karnofsky requested a new examiner, and in April she filed a complaint with the

450  Insurance Department regarding MassMutual's handling, and still no benefits were paid.

17

451    MassMutual continued to receive certification of disability from Dr. Poletti, with permanent

452    restrictions as of April 2010 of no overhead lifting, pushing, or pulling and alternate sitting,

453    standing, and walking. Dr. Karnofsky also continued to take Percocet and Valium for her

454    ongoing pain. Additional medical records were received including the 2010 IME performed by

455    Dr. Pritchard related to the Dr. Karnofsky's accident and resulting injury.

456    MassMutual also received CPT code data that was submitted to Mr. Fresa for review on April

457    23. Mr. Fresca reported the production data was limited and encompasses only 17 days of billing.

458    Dr. Karnofsky's billings included radiology and surgery / nervous system and evaluation and

459    management; she saw 61 patients and billed 121 procedures, seeing an average of four patients a

460    day and about 7 procedures a day. He indicated that more detailed information was needed, but

461    due to her termination it may not be possible to obtain such a report. (MM 1400-1401, 2139 -40)

462    Mr. Fresca identified the categories of procedures that Dr. Karnofsky performed during that 17-

463    day period. He did not, however provide a general description of the duties of an anesthesiologist

464    and the physical requirements necessary to perform those procedures as a part of his analysis.

465    Nor did he explain the interrelationship of the procedures (if any), despite the importance of that

466    information in determining eligibility for ongoing benefits.

467    MassMutual also received updated medical records and certification of impairment in March.

468    The file was not sent for a medical review until April 25, and the review was not completed until

469    May 1. Dr. Parisi noted that Dr. Karnofsky's surgery took place in December and that most

470    likely she had not yet reached MMI. He opined R&Ls concerning the use of her neck are

471    reasonable; the specific level of impairment, however, is unclear. He concurred with Dr. Poletti's

472    restrictions relative to overhead lifting, pushing, pulling, and alternate sitting, standing, and

473    walking. (MM 1343) He noted as well some improvement as reported in Dr. Pacult's February

474    treatment notes, and, that Dr. Karnofsky is continuing to use a bone growth stimulator and will

475    need x-rays in the future to document proper fusion. The prognosis for recovery from the fusion

476    was for slow improvement with time; MMI most likely at the one-year mark.

477    Maximum medical improvement generally relates to the end point of the recovery process.

478    Maximum recovery does not, however, automatically translate to full recovery in functional

479    ability. Dr. Pacult did not specify whether Dr. Karnofsky's functional limitations would change

480 at the point he anticipated she would reach MMI. Dr. Karnofsky's limitations were related to
481 solid healing of the two level cervical fusions. Solid healing of the fusion does not automatically
482 equate to a change in ability to maintain the postural positions necessary for the performance
483 of anesthesia, yet MassMutual never addressed this in its review.

484 Although Dr. Parisi had opined that Dr. Poletti's restrictions were reasonable, upon review of
485 video surveillance conducted over three days he determined Dr. Karnofsky's activities were
486 inconsistent with severe cervical impairment. Dr. Karnofsky was seen moving freely and quickly
487 without signs of impairment. Dr. Parisi noted that he had reviewed the surveillance report as well
488 as significant portions of the video. He did not define, however, how much of the 3 ½ hours of
489 video he observed versus what he read. Furthermore, Dr. Parisi failed to elaborate further as to
490 how Dr. Karnofsky's activities were inconsistent with the R &L's identified by Dr. Poletti.

491 Dr. Karnofsky's claim was related to limited range of motion in her neck and back as well as
492 weakness in her hands, and pain when in positions necessary for the performance of anesthesia,
493 none of which is visible or measurable through surveillance. There is no indication that the
494 activities captured on video were consistent with the functional requirements necessary for the
495 performance of anesthesia. The usual and customary manner for assessing functional ability is to
496 obtain a Functional Capacity Examination, including evaluation of an insured's functional ability
497 while performing tasks similar to those required in the occupation. Dr. Parisi did not recommend
498 an FCE; he did, however, indicate he would call Dr. Poletti regarding current disability and Dr.
499 Pacult regarding the regarding restrictions and limitations for the preoperative period.

500 Dr. Parisi reported Dr. Poletti asked that his questions be submit in writing, and on May 31 a
501 letter was sent asking: whether Dr. Karnofsky could do overhead work at all; whether the
502 overhead and push/pull restrictions were permanent; whether alternate sitting, standing and
503 walking is still required; and, if so, how long she can perform these activities in any given day.
504 (MM 2131) Although Dr. Parisi had identified concerns relative to Dr. Karnofsky's activity level
505 as seen on video, he did not ask Dr. Poletti whether her ability to move about as he had observed
506 was inconsistent with his stated restrictions and limitations. Nor did he ask that Dr. Poletti
507 review the surveillance to determine whether it was inconsistent with his stated restrictions and
508 limitations, as is the usual custom and practice.

509    Dr. Poletti responded: repetitive forward flexion in someone with cervical kyphosis and segment
510    disc herniation is such that it would likely put pressure against that level leading to breakdown at
511    her already worn out c5-6; she has neurological deficit tricep weakness; dysesthesia into her
512    hand; and limited ROM in her neck. It would not be safe to intubate or independently mask
513    patients. She has an element of weakness in her hand that is permanent, and she is not able to
514    return to work as a practicing anesthesiologist.

515    Dr. Parisi also noted; Dr. Poletti's statements are not unreasonable. It would be reasonable to
516    avoid repetitive forward flexion of the neck, but the amount of repetitive forward flexion
517    required by an anesthesiologist is not clear. Dr. Parisi continued to support impairment, and
518    suggested a more detailed physical examination. He also stated; obtaining an understanding of
519    the similarities of her previous anesthesiologist and her current as a pain management physician
520    would be helpful (MM 2128-9)

521    Although Dr. Paris's recommendations were pertinent to understanding eligibility for benefits,
522    MassMutual did not request an IME or FCE, and did not obtain a comparative analysis of Dr.
523    Karnofsky's pre- and post-disability occupational duties. Although the claim file is supposed to
524    contain all information pertinent to the claim, there is no documentation in the file as to why
525    MassMutual chose to disregard Dr. Paris's well-founded recommendations to obtain further
526    medical and vocational information. MassMutuals failure to obtain this information is further
527    evidence of its unfair and incomplete claim investigation.

528    Dr. Parisi opined: As to the IME by Dr. Pritchart related to the pre-operative period between
529    2007 and 2011, the document provided little information regarding function and R&Ls. In the
530    context of a disparity of opinion between in-house/consulting physicians and treating/consulting
531    physicians of the insured, the usual and customary practice in the industry is to contact the
532    treating physician either via a peer to peer call or detailed letter outlining the areas of disparity
533    and if not resolved to obtain an IME or paper file review. Dr. Parisi did not attempt to contact Dr.
534    Pritchard by phone or by letter for further clarification, and instead maintained that the R&Ls
535    from his prior review remain unchanged.

536    Dr. Parisi also indicated he would speak with Dr. Pacult regarding the extent of Dr. Karnofsky's
537    impairment as of 2010. There is no indication in the file, however, that he contacted Dr. Pacult to

538 establish whether it was reasonable to accept liability for total disability as of March 2010, nor is
539 there any explanation for why this did not occur. Despite a recognition that Dr. Karnofsky was
540 impaired as of 2007, there were no further attempts to obtain medical information from
541 physicians Dr. Karnofsky had consulted during that time, including Dr. Geer, Dr. Fisher, or Dr.
542 Faaberg, to determine the extent of impairment from 2007 to 2010.

543 In addition to the medical review in support of impairment, Dr. Karnofsky wrote to MassMutual
544 in April explaining that after the accident in 2007 she had given up days of work, late days, night
545 call and weekends because of pain, procedures, appointments, or her need for medication, and
546 that many days she left early, all of which resulted in a reduction in income. She asked again that
547 MassMutual pay the back benefits due. (MM 1388 -9)

548 MassMutual had undisputed medical evidence in support of continued total inability to perform
549 anesthesia, yet continued to insist on financial information related to Dr. Karnofsky's
550 involvement in the Lowcountry Laserworks and Charleston Pain Center, meanwhile refusing to
551 pay benefits. Dr. Karnofsky's occupation at time of claim was that of an Anesthesiologist,
552 income that she receives through Lowcountry Laserworks and Charleston Pain Center is not
553 pertinent to her eligibility for benefits under her Own Occupation policy. Dr. Karnofsky had to
554 retain an attorney, however, in an effort to obtain the benefits due. MassMutual did not pay total
555 disability benefits until January of 2012; rather than continue to pay benefits with a reservation
556 of rights, MassMutual denied further benefits as of June of 2012 and refused to pay further
557 benefits for another year. Following payment in July of 2013, MassMutual has continued to
558 withhold payments and insisting on financial information that is not pertinent to the claim.

559         **• Know and understand the language and meaning of their insurance policies**
560              **and to administer their claims accordingly.**

561 Dr. Karnofsky's policy defines Occupation as: The insured's regular profession(s) or
562 business(es) at the start of Disability.

563 Total Disability under the Own Occupation Rider states: The Insured is Totally Disabled if
564 he/she cannot perform the main duties of his/her Occupation due to sickness or injury. The
565 insured must be under a doctor's care.

566 Medical reviews acknowledge that Dr. Karnofsky's initial impairment began in 2007 following
567 the MVA; her occupation at the time of her injury was anesthesiologist. She had been working as
568 an anesthesiologist for 18 years following completion of her residency, 14 of which were with
569 Anesthesia Associates of Charleston. In 2011 when Dr. Karnofsky submitted her claim, she had
570 been working in a modified capacity since 2007, and was ultimately terminated in 2010 due to
571 her inability to meet the demands of employment as an anesthesiologist.

572 During the course of the claim, Dr. Karnofsky through her attorney submitted vocational
573 evaluations performed by Ms. Hutchinson from March of 2010 and February of 2012. Both
574 evaluations found that Dr. Karnofsky's restrictions would preclude her ability to work as an
575 anesthesiologist. Dr. Karnofsky's attorney also submitted an IME by Dr. Faaberg which
576 supported an inability to work beyond a sedentary capacity, and reported that the contortions,
577 bending forward, stooping, and wearing lead gowns for her interventional work has significantly
578 impacted her ability to generate the income levels prior to the accident. (MM 1305)

579 In addition to the vocational analysis and medical reviews in support of impairment MassMutual
580 also received a copy of Dr. Karnovsky's malpractice coverage from 2010, which indicated that
581 her professional liability coverage was limited to pain management she had no coverage for
582 anesthesia.

583 In May of 2012, Mr. Barone conducted a second field visit, this time in the presence of her
584 attorney. Dr. Karnofsky explained she has constant cervical and low back pain radiating to her
585 right leg has pain with bending at the waist, is unable to lift more than 10 pounds and is unable to
586 sit or stand more than an hour. Dr. Karnofsky also explained that as an anesthesiologist she spent
587 2/3 of her time on her feet, with little time for breaks and rest; she currently works at a much
588 slower pace and she is under a lot less pressure. She does not perform any anesthesia, she only
589 gives oral sedation or uses Lidocaine injections. (MM 2037) It is evident from the field visit that
590 Dr. Karnofsky was working in a new occupation.

591 Following the field visit, MassMutual was also provided extensive financial and occupational
592 information related to Dr. Karnofsky's income and procedures performed at Lowcountry
593 Laserworks, vocational reports from Ms. Hutchinson, financial loss statements from Mr. Wood,
594 and billing and management documents from TriCoastal Billing. MassMutual still insisted she

595    provide further information regarding P&Ls from Lowcountry Laserworks, and pay stubs and
596    K-1's from Anesthesia Associates of Charleston.

597    Dr. Karnofsky was totally disabled and not working in her occupation as an anesthesiologist, as
598    noted previously, income from her new occupation is not relevant. The same is true as to the
599    financial information being requested relative to Anesthesia Associates. Eligibility for total
600    disability is premised upon an inability to perform occupational duties, pay stubs and K-1's do
601    not provide information regarding an insured's duties and are only pertinent in the context of a
602    partial disability when a  loss of at least 20 % is required for payment.

603    Although Dr. Karnofsky described the manner in which her neck and back pain impacted her
604    ability to perform anesthesia, following the field visit MassMutual did not send the file for a
605    vocational review to determine the physical requirements necessary to perform anesthesia,
606    including the physical demands related to other interventional work or compare Dr. Karnofsky's
607    current work at the Lowcountry Laserworks and Charleston Pain Center with the duties of an
608    anesthesiologist.

609    In September 2012, Dr. Poletti (AP) explained Dr. Karnofsky has restricted range of motion in
610    all planes in her neck, and has continued presence of disc protrusion and herniation at the C5-6
611    as well as ankyloses at c-6-7 causing increased pressure at c5-6.  She has pain radiating into her
612    arms, and atrophy, weakness, and dyesthesia into her hands, with loss of fine motor coordination
613    of her hands consistent with cervical spondylitic radiculopathy, and possibly early myelopathy. It
614    impacts her ability to do pain management, utilize a needle, intubate patients, and work in the
615    capacity that would be required of an anesthesiologist. (MM 1074- 1075)

616    The file was referred to Mr. Miles, chief claim consultant for MassMutual. Mr. Miles opined at
617    present we have accepted July 12 as the commencement date of total disability and have
618    provided benefits through March of 2012 under ROR. We have requested documentation to
619    determine eligibility during April 2007 and July 2011 and from March 2012 to the present,
620    however the information remains outstanding. Based on the information in the file, the insured
621    does not satisfy the eligibility requirements under her Own Occupation Rider and the financial
622    information necessary to evaluate partial disability is outstanding. He recommended the claim be
623    closed and (MM 1078) six days later MassMutual informed Dr. Karnofsky of the denial.

624    On September 18 Ms. Mykytiuk informed Dr. Karnofsky's attorney of the denial, and in doing

625    so explained she had relied on information obtained in the production reports from Anesthesia

626    Associates of Charleston, P A. from April 2006 through March 2007 which revealed the twelve

627    (12) months immediately prior to April 2007, seventy-three percent (73%) of patients

628    Karnofsky's patients were treated for pain management services and billed under the Current

629    Procedural Terminology (CPT) codes 62310 and 62311. She stated; it is our understanding that a

630    significant portion of the main duties performed by Dr. Karnofsky in her Occupation prior to the

631    onset of her reported disability was related to pain management.

632    Production reports from Anesthesia Associates of Charleston from April 2007 to March 2010

633    and TriCoastal Healthcare Billing and Management for the period of March 2010 through March

634    2012, showed during both her claimed Partial Disability period of April 10, 2007 through April

635    14, 2010, and her claimed Total Disability period from April 15, 2010 through March 2012, she

636    continued to bill for pain management services throughout this time. (MM2022) She denied

637    benefits for total disability and provided the definition of partial disability and requested further

638    financial information.

639    MassMutual's determination that Dr. Karnofsky was partially disabled due to her ability to

640    continue to perform pain management procedures is contrary to the policy language.

641    Determination of partial disability is based on the insured suffering a disability while working in

642    his or her occupation (emphasis added) and, experiencing a loss of income related to the

643    disability, and, is under a physician's care. (MM  2029)

644    Although there is evidence that Dr. Karnofsky performed pain management procedures in her

645    occupation as an anesthesiologist, there is no vocational information supporting the

646    determination that prior to 2010 Dr. Karnofsky's occupation was that of a pain management

647    specialist. Dr. Karnofsky was employed as an anesthesiologist, she had anesthesia privileges, she

648    performed surgical Anesthesia, was on anesthesia call and was insured as an anesthesiologist; as

649    a part of her work as an anesthesiologist she also performed pain management procedures.

650    MassMutual's entire claims analysis focused on the duties Dr. Karnofsky performed without

651    ever conducting an analysis of the occupation of anesthesiologist.

652

653 The O'Net is an Occupational analysis tool available on the internet which is utilized by many
654 insurers in evaluating occupations. This tool has been available for a number of years and is
655 generally preferred over the Dictionary of Occupational Titles as it is more current and provides
656 more in-depth information regarding the various occupations.

657 O'Net's description of anesthesiologist states:

658 ### 29-1061.00 - Anesthesiologists

659 Physicians who administer anesthetics prior to, during, or after surgery or other medical
660 procedures.

661 **Sample of reported job titles:** Anesthesia Associate, Anesthesia Director, Anesthesia
662 Resident, Anesthesiologist, Attending Anesthesiologist, Medical Doctor (MD),
663 Obstetrical Anesthesiologist, Physician Anesthesiologist, Staff Anesthesiologist, Staff
664 Anesthetist

665 **Tasks include** Tasks

666 • Monitor patient before, during, and after anesthesia and counteract adverse reactions or
667 complications.

668 • Record type and amount of anesthesia and patient condition throughout procedure.

669 • Provide and maintain life support and airway management and help prepare patients for
670 emergency surgery.

671 • Administer anesthetic or sedation during medical procedures, using local, intravenous, spinal,
672 or caudal methods.

673 • Examine patient, obtain medical history, and use diagnostic tests to determine risk during
674 surgical, obstetrical, and other medical procedures.

675 • Position patient on operating table to maximize patient comfort and surgical accessibility.

676      •    Coordinate administration of anesthetics with surgeons during operation.

677      •    Decide when patients have recovered or stabilized enough to be sent to another room or ward
678                  or to be sent home following outpatient surgery.

679      •    Confer with other medical professionals to determine type and method of anesthetic or
680                  sedation to render patient insensible to pain.

681      •    Order laboratory tests, x-rays, and other diagnostic procedures.

682      •    Tools & Technology

683      •    **Tools** used in this occupation:

**Arterial line catheters** — Intra-arterial catheters; Swan Ganz artery catheters

**Cardiac output CO monitoring units or accessories** — Heart rate monitors; Invasive hemodynamic pressure monitors

**Electronic stethoscopes or accessories** — Precordial stethoscopes; Pretracheal stethoscopes

**Endotracheal or tracheotomy sets** — Tracheostomy sets

**Gas anesthesia apparatus** — Anesthesia gas concentration monitors; Anesthesia monitors; Digital anesthesia machines; Gas anesthesia administration machines

684 In addition, Dr. Karnofsky's attorney had provided an employability evaluation by Ms.
685 Hutchinson dated January 9, 2012 which contained the DOT description of Anesthesiologist
686 noted below:

687    ANESTHESIOLOGIST (070.101-010):

688        "Administers anesthetics to render patients insensible to pain during surgical, obstetrical,
689        and other medical procedures: Examines patient to determine degree of surgical risk, and
690        type of anesthetic and sedation to administer, and discusses findings with medical

691  practitioner concerned with case. Positions patient on operating table and administers
692  local, intravenous, spinal, caudal, or other anesthetic according to prescribed medical
693  standards. Institutes remedial measures to address adverse reactions or complications.
694  Records type and amount of anesthetic and sedation administered and condition of patient
695  before, during, and after anesthesia. May instruct medical students and other personnel in
696  characteristics and methods of administering various types of anesthetics, signs and
697  symptoms of reactions and complications, and emergency measures to employ."

698  She noted: "Dr. Karnofsky's past work experience is consistent with these definitions."

699  MassMutual never asked Mr. Fresca to address the impact Dr. Karnofsky's restrictions and
700  limitations would have on her ability to perform her duties as an anesthesiologist despite its
701  obvious importance to the determination of eligibility for benefits.

702  Dr. Karnofsky was employed as an anesthesiologist until April of 2010, following her cessation
703  of work in April of 2010; she has never resumed this role consistent with Dr. Poletti's
704  recommendation that she not return to anesthesia.

705  Dr. Poletti stated:

706  "Repetitive forward flexion in someone with cervical kyphosis and segment disc herniation is
707  such that it would likely put pressure against that level leading to breakdown at her already
708  worn out c5-6, she has neurological deficit tricep weakness and dysesthesia[16] into her hand
709  and limited ROM in her neck, it would not be safe to intubate or independently mask
710  patients, she has an element of weakness in her hand which is permanent and she is not able
711  to return to work as a practicing anesthesiologist." (MM 1090) (emphasis added)

712  MassMutual's determination that Dr. Karnofsky is partially disabled, despite the fact that she is
713  no longer working in her occupation as an anesthesiologist and is medically unable to do so,
714  renders the definition of Own Occupation Policy under the policy meaningless.

715  • **MassMutual failed to consider the interest of its insured equal to its own.**

---

[16] **Dysesthesia** (dysaesthesia) comes from the Greek word "dys", meaning "not-normal" and "aesthesis", which means "sensation" (abnormal sensation).

716    In December of 2012, following denial of total disability and closure of the claim, Attorney
717    Kefalos submitted income and procedure information from 2004 to 2010. Records clearly show
718    that Dr. Karnofsky's billings for both anesthesia and blocks decreased following her accident in
719    2007 consistent with her reports that she had modified her duties while seeking treatment to
720    resolve her chronic pain. A review of that information reflects that Dr. Karnofsky's billings for
721    blocks for the three years prior to disability were $ 373,864, her Anesthesia billings $340,963.
722    Billings from 2007 to 2009 following her injury were $298,417 for blocks and $269, 619 for
723    Anesthesia, her drop in procedures consistent with her reports of modification of her duties and
724    her hours.

725    MassMutual reopened the claim. It did so, however, without issuing any benefits, even with a
726    reservation of rights, and continued to insist on further financial documentation despite Mr.
727    Kefalos' repeated requests for an explanation as to why information from her new occupation
728    was relevant, (MM 822) and undisputed medical evidence supporting the inability to perform
729    anesthesia. MassMutual continued to insist on further information pertaining to Lowcountry
730    Laser Works and Charleston Pain Center, and focused its investigation on establishing partial
731    disability and not on conducting a fair, thorough, and objective investigation of eligibility for
732    total disability. Consistent with its actions prior to the denial of the claim, MassMutual did not
733    conduct a fair, thorough, and objective evaluation of Dr. Karnofsky's predisability occupation.
734    Nor did they obtain an IME or FCE to establish the reasonableness of her restrictions and
735    limitations, contrary to its contractual obligation to do so as well as industry practice.

736    Mr. Kefalos submitted financial information from Anesthesia Associates in March, including
737    schedule Ks from 2000-2009, pay stubs from March 2007 to April 2010, as well as production
738    data. (MM 962)-76) He provided a response to questions MassMutual had relative to the
739    production information that had been produced. Mr. Kefalos explained that the assignment sheets
740    he had provided were from Anesthesia Associates and that the formulas regarding units worked
741    represented the actual credit Dr. Karnofsky was entitled to based on the nature of the job she
742    performed.  Ghost units represented the difference between the guaranteed credits and the
743    amount Dr. Karnofsky might have fallen short of the guarantee. He explained as well that
744    following the accident Dr. Karnofsky no longer worked weekends and that income reported after
745    April 2010 was for work performed prior to that date.

746   In May, Mr. Kefalos provided P&L's for LowCountry Laserworks from January 2010 to March

747   2013, and was attempting to get records regarding Charleston Pain Care as well as bank

748   statements. He also had submitted an APS from Dr. Poletti dated November 2011 with the

749   permanent restrictions of no lifting, reaching, pushing, pulling, and alternating sitting and

750   standing.

751   In addition to the financial information provided, MassMutual ordered a pharmacy search that

752   found 14 pages of prescriptions that Dr. Karnofsky had obtained for her ongoing chronic pain.

753   Although many of the prescribed medications have known cognitive as well as physical side

754   effects, including potential for addiction and cognitive impairment, the records were not sent for

755   a medical review or vocational review to determine what if any impact the use of such

756   medications would have on Dr. Karnofsky's employability as an anesthesiologist working in a

757   hospital and surgery center based environment.

758   MassMutual conducted a financial review on June 4th and determined, based on the information

759   it had obtained, that if Dr. Karnofsky's losses were to be equally spread out across the months

760   for those two years she would realize in excess of a 75% loss. A 75% loss entitles Dr Karnofsky

761   to 100 % of the monthly benefit payment.

762   The file was forwarded for review to MassMutual's Chief Claim Consultant in June. Ms.

763   Mykytiuk outlined the information obtained from Anesthesia Associates of Charleston and

764   Tricoast Healthcare and Billing Management. She concluded that Dr. Karnofsky did not satisfy

765   the definition of total disability, as she continued to bill for pain management services

766   throughout the entire time. Ms. Mykytiuk recommended denial of the claim for both total and

767   partial benefits. (MM 1991-2)

768   Three weeks after the recommendation to deny both total and partial benefits, a meeting was held

769   between Mr. Miles (Claim Consultant), Ms. Mykytiuk, Mr. McDonough, and an individual

770   whose name was blacked out. The determination was made to consider further surveillance and

771   the merits of arranging an IME. There is nothing noted regarding payment of the claim, despite

772   the unwarranted delay in reviewing the file, and clear evidence of ongoing impairment and

773   financial loss that would equate to payment of a full benefit.

774  MassMutual's recommendations regarding surveillance and an IME reflect a continued focus on
775  avoiding payment under the policy. As noted previously, surveillance does not provide objective
776  evidence of impairment in the context of an own occupation in which the insured is suffering
777  chronic pain and hand weakness.

778  As for the IME, MassMutual had not conducted a medical review in nearly a year, the last
779  review having been July 2012. In that review, Dr. Parisi opined Dr. Poletti's opinion as to Dr.
780  Karnofsky's restrictions and limitations were not unreasonable. Dr. Parisi recommended at that
781  time the possibility of an IME as it relates to the degree of hand and tricep weakness, as well as
782  her restriction in range of motion of her neck. He also noted it would be helpful to know the
783  similarities and differences between her previous occupation as an anesthesiologist and her
784  current activities as a pain management physician. (MM 1087) Dr. Parisi appears to recognize
785  that hand strength and neck range of motion are essential to the performance of anesthesiologist.
786  Dr. Parisi also recognized that Dr. Karnofsky was performing a different occupation than that of
787  anesthesiologist, yet MassMutual failed to follow up on either of these recommendations, and
788  instead focused purely on the financial aspects of the claim as a means to avoid payment of total
789  disability.

790   On July 19, J. Lindsey conducted a financial review and determined that Dr. Karnofsky's
791  income was as follows: 2004 $178,552; 2005 $174,069; 2006 $160, 276; 2007 $ 161,269; the
792  year of injury, 2008 - $ 141.966; 2009-$ 102,412; 2010- $52,424. Dr. Karnofsky's total income
793  dropped from $181,979 in 2007, to a negative income in 2009 and 2010. Her average monthly
794  earnings dropped from $15,167 a month in 2007 to a negative $11,012 in 2010. (MM 1880)

795  On July 23, following the financial review reflecting a loss of earnings from 2008 and beyond, a
796  second team meeting was held with Mr. Miles, Melissa McDonough, and Ms. Mykytiuk.

797  The decision was to inform Dr. Karnofsky that MassMutual was unable to consider disability
798  benefits for any period of time prior to the retroactive time limit of one year and 90 days, as
799  specified in the proof of Disability provision, and that the earliest retroactive date it would accept
800  is June 12, 2010. (MM1982)

801 There is no explanation in the file as to why, after two years of investigating the claim, and upon
802 receipt of medical and financial information in support of continuous impairment and income
803 loss, MassMutual suddenly decided to apply the proof of loss provision of the policy. Once
804 again, in the face of compelling information in support of payment, MassMutual placed its
805 financial interests above those of its insured.

806 From the onset of the claim MassMutual's claim process was unduly burdensome and, in my
807 opinion, in violation of the company's contractual obligations under the policy as evidenced by:

808 • It's failure to conduct a proper vocational analysis
809 • It's continued focus on partial disability in the absence of thorough review of Dr.
810   Karnofsky's pre disability occupation.
811 • Its continuing requests for irrelevant financial information regarding current work in her
812   new occupation
813 • It's use of the proof of Disability provision as a means of denying past benefits only after
814   insisting for nearly two years that Dr. Karnofsky submit medical, financial and
815   occupational data for that time period
816 • Its failure to obtain an FCE or IME.

817 On August 2, MassMutual informed Dr. Karnofsky of its determination to deny total disability as
818 well as past due benefits, and in doing so stated among other things:

819   "...As previously stated, Dr. Karnofsky's eligibility for Total Disability benefits is based
820   on her inability to perform the main duties of her Occupation. The policy, in fact, refers
821   to the plural "duties," not a single "duty." Based on the currently known facts,
822   MassMutual believes that Dr. Karnofsky can still perform (and is performing) the
823   majority of the "main duties" she was engaged in (and from which she was earning
824   income on) prior to her alleged Disability onset date. Therefore, during these time periods
825   which she has this functional capacity, she does not satisfy the eligibility requirements of
826   Total Disability" (MM 1980)

827 In the context of disability claims it is commonly understood within the industry that ambiguities
828 in the policy are to be construed in favor of the insured. Although Ms. Mykytiuk relies on the

829  policy language "main duties" as the basis of her denial, the policy does not provide any
830  definition for main duties, thus providing guidance to its insureds or its claim staff. In the context
831  of Own Occupation disability claims, insurers often define "material and substantial duties" or
832  "main duties" as those duties which cannot reasonably be omitted for that occupation to remain
833  intact. It is also understood that the inability to perform just one duty may result in total
834  disability. Dr. Karnofsky's inability to administer anesthesia makes it impossible for her to be an
835  anesthesiologist as the occupation is defined in the DOT, which is the only occupational
836  description contained in the claim file other than Dr. Karnofsky's reports.

837  MassMutual's administration of Dr. Karnofsky's claim is similar to that which was found to be
838  of concern in one of two separate Market Conduct Examination of one of the nation's leading
839  disability insurers, which was the 2005 California Insurance Department Market Conduct
840  Examination of one of the nation's leading disability insurers. Although the examination did not
841  involve MassMutual, the examination and findings were a topic of legal bad faith seminars and
842  industry fair claims training seminars, as they were felt to be pertinent standards for all insurers
843  for conducting a fair, thorough, and objective review of disability claims.

844  The areas of concern identified by the examiners included among other things:

845  "The Companies sold coverages for disabilities relating to medical specialties, but failed to
846  provide coverage when the claimants could no longer perform their medical specialty. The
847  companies accomplished this be performing a review of the claimants' medical billing
848  records. If for example, the billing records indicated the majority of the time spent by a
849  surgeon was in consultations, case presentations, or follow ups rather than actual surgery,
850  then the surgeon was not considered disabled if he or she could no longer perform
851  surgery." (CALIFORNIA MCE 15-16)

852  MassMutual has had undisputed medical evidence of impairment and financial evidence of a
853  reduction in income and duties following her accident in 2007 and yet refused to pay back
854  benefits. It also had certification from her treating physician, Dr. Poletti, that as of April of 2010
855  Dr. Karnofsky had permanent restrictions related to overhead lifting climbing, walking or sitting
856  for long periods of time, no repetitive grasping pushing pulling or fine manipulation of both
857  hands 00580. Following her surgeries Dr. Poletti also reported restricted range of motion in her

858 neck and hand weakness, which precluded her from being able to safely perform anesthesia and
859 yet MassMutual continues to administer the claim as a partial disability. (MM 2127-2129)

860 Following the denial of past benefits, Mr. Kefalos contacted MassMutual in an attempt to obtain
861 the past benefits due under the policy. MassMutual lawyer Ms. Joyce, however, insisted the
862 company was within its rights to deny benefits, and MassMutual has continued to maintain its
863 position regarding past due benefits. MassMutual's denial of benefits prior to June of 2010
864 places the interest of the company above that of its insured, as does its continued refusal to pay
865 total disability beyond the limited time period following her surgery from July of 2011 to June of
866 2012.

867 Mr. Kefalos continued to submit information as requested including monthly profit and loss
868 statements of: Lowcountry Laser for June 2012 to August 2013; billing records and charges for
869 Charleston Pain Care for August 2012 to August 2013; as well as tax returns for 2009 -2011 for
870 Lowcountry Laser and Charleston Pain Center. (MM 2121) October 3, 2013 Ms. Lindsay
871 conducted a financial review noting there were monthly profit and loss statements from
872 Lowcountry and that the annual losses reported on the tax returns had been recorded.

873 In January of 2014 Mr. Kefalos submitted 2012 Tax returns and Schedule Cs for both Charleston
874 Pain Care and Lowcountry Laserworks. Lowcountry Laser showed a net loss of $88,327 for
875 Lowcountry Laserworks and a profit of $13,809. Ms. Lindsey reported that the information
876 provided, although not an accurate representation of the insured's net income (Loss), indicates
877 she has well in excess of the requisite 75% loss. (MM 2120)

878 As noted throughout this report, Dr. Karnofsky's involvement in Lowcountry Laserworks and
879 Charleston Pain Care occurred after she was no longer able to perform anesthesia and was no
880 longer working as an anesthesiologist. Dr. Karnofsky's work at Lowcountry Laserworks and
881 Charleston Pain Care Center did not involve performing duties of an anesthesiologist, therefore
882 there was no basis for continued requests for financial information.

883 In addition, Mr. Kefalos also submitted updated medical information, including a June 2012
884 report from Dr. Faaberg certifying to continued disability as an anesthesiologist and limitations
885 to sedentary work due to a worsening of her condition. In addition to Dr. Karnofsky's physical

complaints, Dr. Faaberg indicated Dr. Karnofsky should seek treatment with a psychiatrist for her depression, anxiety, and panic disorder. Records reflect ongoing treatment in 2012 -2013 including:

- August 14, 2012 cervical radiculopathy injection brachial neuritis
- January 9, 2013 injection for cervical and lumbar radiculopathy. Records from February of 2013 reflect Cervical radiculopathy at C7, repeat injections and symptoms of hand shakiness and left lateral leg pain. Her medications consisted of Meloxicam, Concerta, Clonazepam, Lidoderm patch, Wellbutrin, Lorazepam, and Lortab. (MM 1488 -9)
- April MRI which found; Mild non-compressive spondylosis. C3-4. Osteophytes with mild to moderate foraminal stenosis at C4-5. Mild non-compressive spondylosis CS-6. Osteophytes with severe right and moderate to severe left foraminal stenosis C6-7. Fusion with hardware and mild residual foraminal stenosis C7-T1. Mild noncompressive spondylosis. (MM 1514)
- May 30, 2013 Patient comes today complaining of positional weakness in her upper extremities, particularly hands. She says when she looks down, especially at the end of the day, she has some decreased fine movements in both hands. MRI unremarkable except for disc degeneration at C5-C6 without significant compression of the spinal cord... the area of the fusion at C6-7looks good. His plan was to compare the most recent MRI with her preoperative MRI and if no change, refer to neurologist for evaluation. Perimenopausal, Adult attention deficit disorder, Cervical disc disease, HTN
- August 21, 2013 injection for lumbosacral neuritis
- December 10, 30, 2013 injection for brachial neuritis, cervical radiculopathy (MM 1465)

Although medical records reflect ongoing treatment for pain, including injections and multiple prescriptions for her pain, depression, and anxiety, MassMutual failed to conduct any further medical review and instead focused entirely on obtaining financial information. MassMutual also insisted on documentation far beyond the scope of the contractual requirements, including among others an explanation as to Dr. Karnofsky's reasoning for maintaining a business that has produced such significant losses since inception.

914    Attorney Kefalos filed a complaint /suit on February 6, 2014 (MM 1943), he also replied to
915    MassMutual's inquiries regarding Dr. Karnofsky's business and explained, "Dr. Karnofsky has
916    been trying to begin a new business and believes can be profitable and support her and her
917    family." He stated further, "Dr. Karnofsky has most of her life savings invested in the business,
918    and has a five year lease and $50,000 in renovations; had she been receiving benefits she would
919    be closer to hiring help and market properly, and it would likely have been profitable by now."

920    He explained as well the 43,000 miles in business travel are related to networking, marketing,
921    trade show, training, and education. He asked again for benefits to be provided for the period of
922    June 2012 to September 2013 as he had provided all of the information requested for that time
923    period. (MM 1941)

924    Mr. Kefalos reported among other things, "Dr. Karnofsky has two 17-year-old sons graduating
925    from high school and she has barely been able to feed them and put gas in the car, her house is
926    falling apart and she is unable to afford help or repairs. One son is suffering from severe
927    depression directly related to the trauma of the complete life style change, and has no health
928    insurance coverage. Dr. Karnofsky is on multiple medications for anxiety, depression, and PTSD
929    related to the accident injuries loss of her job and her horrific problems with MassMutual." (MM
930    1942) Despite Dr. Karnofsky's obvious financial concerns no further benefits were issued.

931    Mr. Kefalos also included an APS from Dr. Poletti noting MRI findings of severe spondylosis,
932    probable nerve root compression c5-6, artificial disc replacement c6-7, adjacent segment disease
933    at c5-6 and C7 T1, spasticity in upper extremities and difficulty with fine motor movements, and
934    pain her prognosis was listed as fair to poor ... (MM 1938-39) Rather than refer the file for a
935    medical review or obtain an IME to determine the impact of Dr. Karnofsky's ongoing pain and
936    newly diagnosed psychiatric conditions would have on her employability as an anesthesiologist,
937    MassMutual conducted 33 hours of surveillance over 4 days and found nothing.

938    MassMutual recommend a vocational review on November 22, 2013 prior to receipt of the
939    updated medical records and, on February 4, 2014 for the first time since the inception of the
940    claim, asked Mr. Christenson to identify: the occupational duties, physical and/or psychological
941    demands and/or work temperaments and appropriateness of any potential rehabilitation services.

942   The request to conduct a comparison between Dr. Karnofsky's current aesthetic occupation and
943   pain management is evidence that MassMutual was fully aware of the fact that Dr. Karnofsky
944   was not working in her usual and customary occupation. Despite the obvious importance of this
945   analysis in establishing eligibility under the policy, Mr. Christenson was not asked to conduct the
946   comparison, nor was he asked to distinguish between the occupation of anesthesiologist, of a
947   pain management specialist, and Aesthetics. (MM 1950 -52) There was no vocational review
948   done by Mr. Christenson's instead as noted previously MassMutual relied on a review of duties
949   performed by financial consultants Nawrocki & Smith.

950   Although new medical information was obtained after the vocational referral, there is no
951   indication that the additional information was submitted for consideration. The referral also did
952   not list any of the multiple medications that Dr. Karnofsky was taking or the restrictions and
953   limitations set forth by her treating physicians as is the usual standard.

954   The November 22 consultation also indicates that Dr. Karnofsky's decision to set up a new
955   business was a choice, and that her level of impairment is unclear. Dr. Karnofsky had explained
956   on numerous occasions throughout the claim that she began to seek alternative careers after
957   recognizing her attempt to continue working within the parameters of her pain and physical
958   limitations was no longer feasible. MassMutual's assertion that Dr. Karnofsky simply made a
959   choice to change careers shows complete disregard for her efforts following the accident in 2007
960   to continue in her profession as an anesthesiologist.

961   MassMutual's assertion that the level of impairment is unclear disregards significant objective
962   medical information in support of impairment. It also shows evidence of MassMutual's failure to
963   properly investigate the claim, including the failure to obtain current medical reviews, no peer to
964   peer contacts and no IME/FCE.

965   MassMutual's failure to obtain an IME is consistent with actions found to be of concern in the
966   2004 Multi State Market Conduct Examination of the same leading disability insurer. (Line 843-
967   845) Like the California Market Conduct Examination, the purpose of the examination was to
968   determine if claims handling practices were in violation of the NAIC Unfair Method of
969   Competition and Unfair Deceptive Acts and Practices in the Business of Insurance Model AT of
970   1972 or the Unfair Fair Claims Settlement Practices Model Act (MM 1990)

971     •   **The Examiners found among other things, "An excessive reliance on in-house**
972        **medical staff to support the denial, termination, or reduction of benefits.**

973        [T]he company relied heavily upon the analysis of their in-house
974        medical professionals, and refrained from securing an IME. In many such
975        instances, the companies discounted or disputed the opinions of claimant's
976        attending physicians, but chose not to invoke the requirement that the
977        claimant attend an IME. Where there is conflicting medical evidence, or
978        conflicting medical opinions with respect to a claimant's eligibility for
979        benefits, the companies have the ability to invoke the policy provision and
980        obtain an IME, and should do so. (Market Conduct Examination Report,
981        November 18, 2004, 0007)

982 MassMutual had undisputed evidence that Dr. Karnofsky was impaired from performing
983 anesthesia due to her ongoing pain, weakness in her hands and triceps, and limited range of
984 motion in her neck; it also had evidence of her use of multiple medications known to potentially
985 impact physical and cognitive function. Despite the recommendation of its in-house physician
986 and claim consultant, MassMutual never obtained an IME.

987 Rather than conduct a fair, thorough, and objective evaluation of Dr. Karnofsky's claim,
988 MassMutual obtained 4 database searches, including a comprehensive business search, social
989 media search, and pharmacy record search. (MM; 620, 928, 1522, 1597) MassMutual also
990 requested surveillance on three separate occasions (March 2012, June 2013 [MM1874,] and
991 February 2014, [MM 1929]) and observed Dr. Karnofsky for 10 days, most days the majority of
992 the day.

993 In the absence of an appropriate medical and vocational evaluation, MassMutual denied total
994 disability benefits, and insisted Dr. Karnofsky submit literally thousands of pages of pages of
995 financial documentation, which resulted in Dr. Karnofsky hiring an attorneys at her own expense
996 to assist her, ultimately filing suit in an attempt to obtain total disability benefits under
997 the policy.

998

999 • **MassMutual failed to conduct a fair, thorough, and objective evaluation.**

1000 The two most critical elements of an evaluation of total disability in the context of an Own
1001 Occupation are a thorough understanding of the occupational duties of the insured, including the
1002 physical / cognitive functions necessary to perform them and the nature and extent of the
1003 medically-based functional impairment of the insured, and the impact those functional
1004 impairment would have on the ability to perform the material and substantial duties.

1005 Despite its obligation to do so, MassMutual never conducted a thorough investigation of the
1006 occupational duties of anesthesiologist, and failed to consider Ms. Hutchinson's vocational
1007 assessment that had been provided by Dr. Karnofsky's attorney. In addition, MassMutual never
1008 obtained further information including such things as the criteria for obtaining and maintaining
1009 hospital or surgery center based anesthesia privileges, malpractice coverage, and licensure.

1010 It is commonly understood within the disability insurance industry that physicians must meet
1011 certain educational, physical, and ethical requirements, to assure the health and safety of patients
1012 as well as minimize any potential liability risks for the entities that employ them. Dr. Karnofsky
1013 was following the advice of her physician that she should stop performing anesthesia as she
1014 could not safely intubate or mask patients. MassMutual failed to address any of these
1015 considerations in its review.

1016 Regarding Dr. Karnofsky's total disability as an anesthesiologist after June of 2012, despite
1017 numerous references throughout the file indicating the actual extent of Dr. Karnofsky's
1018 impairment is unclear, (July 2011 medical review, May 2012 medical review, November 22
1019 2013 Chief Consultant review 2021) MassMutual did not obtain an IME or FCE or conduct any
1020 peer to peer calls with her treating physicians. Dr. Parisi appropriately made the recommendation
1021 to obtain and IME (MM 2128), as did MassMutual's chief claim consultant. (MM 751, 1952)
1022 MassMutual, however, failed to obtain an IME or FCE, despite its contractual right to request
1023 one and failed to provide an explanation for its failure to comply with the Dr. Parisi and chief
1024 claim consultant Miles' recommendations.

1025 MassMutual had undisputed evidence that Dr. Karnofsky was impaired from performing
1026 anesthesia due to her ongoing pain, weakness in her hands and triceps, and limited range of

motion in her neck; it also had evidence of her use of multiple medications known to potentially impact physical and cognitive function. Despite the recommendation of its in-house physician and claim consultant, MassMutual never obtained an IME and refused to pay any further benefits.

Rather than conduct a fair, thorough, and objective evaluation of Dr. Karnofsky's claim, MassMutual obtained 4 database searches, including a comprehensive business search, social media search, and pharmacy record search. (MM; 620, 928, 1522, 1597) MassMutual also requested surveillance on three separate occasions (March 2012, June 2013 [MM1874,] and February 2014, [MM 1929]) and observed Dr. Karnofsky for 10 days, most days the majority of the day.

In the absence of an appropriate medical and vocational evaluation, MassMutual denied total disability benefits, and insisted Dr. Karnofsky submit literally thousands of pages of pages of financial documentation, which resulted in Dr. Karnofsky hiring an attorneys at her own expense to assist her, ultimately filing suit in an attempt to obtain total disability benefits under the policy.

It is for all of the reasons above that I am of the opinion that MassMutual failed to comply with its duty of good faith and fair dealing in its refusal to pay total disability and its burdensome and unwarranted requests for extensive financial documentation related to Dr. Karnofsky's new occupation.

I understand additional documentation may be provided for review. I therefore reserve the right to modify this opinion.

Mary E. Fuller, MEd                    December 4, 2014